UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 09-212-JBC

STEPHANIE HENDRIX,                                                          PLAINTIFF,

V.                              MEMORANDUM OPINION AND ORDER

MICHAEL J. ASTRUE, COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION,                                    DEFENDANT.

* * * * * * * * * *

This matter is before the court upon cross-motions for summary judgment. R. 9, 10. The court will deny the plaintiff's motion (R. 9) and grant the defendant's motion (R. 10).

I.      **Overview of the Process**

Judicial review of the decision of an Administrative Law Judge ("ALJ") to deny disability benefits is limited to determining whether there is substantial evidence to support the denial decision and whether the Secretary properly applied relevant legal standards. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" is "more than a scintilla of evidence, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994). The court does not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See id.* Rather, the

ALJ's decision must be affirmed if it is supported by substantial evidence, even though the court might have decided the case differently. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

In determining disability, the ALJ conducts a five-step analysis. At Step 1, the ALJ considers whether the claimant is performing substantial gainful activity; at Step 2, the ALJ determines whether one or more of the claimant's impairments are "severe"; at Step 3, the ALJ analyzes whether the claimant's impairments, singly or in combination, meet or equal a listing in the Listing of Impairments; at Step 4, the ALJ determines whether the claimant can perform past relevant work; and finally, at Step 5 – the step at which the burden of proof shifts to the Commissioner – the ALJ determines, once it is established that the claimant cannot perform past relevant work, whether significant numbers of other jobs exist in the national economy which the claimant can perform. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); 20 C.F.R. § 404.1520.

II.   **The ALJ's Determination**

At the time of the onset of her alleged disability, Stephanie Hendrix was thirty-three years of age. AR 19. Hendrix has past relevant work experience as a cashier, a certified nursing assistant, and internal support (inputting data, typing, and sorting mail) at a bank. AR 157-64. She applied for supplemental security income ("SSI") (AR 99-103) and disability insurance benefits ("DIB") (AR 104-108) on May 20, 2006, alleging disability due to several impairments including

fibromyalgia, multiple sclerosis, and mental impairments such as cognitive disorder, affective disorder, anxiety disorder, and borderline personality disorder (R. 9 at 2). Her claims were denied initially on August 30, 2006 (AR 77-80), and again upon reconsideration on November 22, 2006 (AR 82-85, 86-88).  After a hearing on September 6, 2007 (AR 21-59), Administrative Law Judge ("ALJ") Don Paris determined that Hendrix did not suffer from a disability as defined by the Social Security Act (AR 10-20).

    At Step 1, the ALJ found that Hendrix had not engaged in substantial gainful activity since the alleged onset date of her disability, May 30, 2006.  A 12.  At Step 2, the ALJ found that Hendrix suffered from the following combination of impairments considered "severe" under 20 CFR 404.1520(c) and 416.920(c): fibromyalgia syndrome; possibility of multiple sclerosis; and mental impairments in the form of a cognitive disorder, affective disorder not otherwise specified, anxiety disorder not otherwise specified, and borderline personality disorder.  AR 13-15. The ALJ then determined at Step 3 that Hendrix's impairments did not meet or equal a listing in the Listing of Impairments in 20 CRF § 404, Subpart P, Appendix 1.  AR 15.

    At Step 4, the ALJ determined that Hendrix was unable to perform any past relevant work.  AR 19.  Finally, the ALJ determined at Step 5 that, due to Hendrix's age, education level, work experience, and residual functioning capacity ("RFC"), jobs exist in significant numbers in the national economy that she can

perform.  AR 17.  Thus, the ALJ denied Hendrix's claims for SSI and DIB on November 29, 2007.  AR 7-9.  Hendrix appealed the decision, and the Appeals Council denied her request for review on April 21, 2009.  AR 1-4.  Following the denial, Hendrix filed this action.  R. 2.

### III.   Legal Analysis

Hendrix challenges the ALJ's decision on a number of grounds.  First, she argues that the ALJ failed to give proper deference to the restrictive medical assessment of her treating physician, Dr. Jennifer Joyce.  Second, Hendrix alleges that the ALJ failed to consider the impairments she suffered – specifically, that the ALJ should have given greater weight to her testimony and found that her impairments were severe enough to meet the listed impairments.  The court will consider these arguments in turn.

   A.   The ALJ justifiably accorded limited weight to Dr. Joyce's opinions.

The ALJ properly considered all medical opinions in the record and provided explanations for the weight he gave to each, in accordance with SSA regulations, so his RFC and disability determinations are supported by substantial evidence.  20 C.F.R. § 404.1527(d)(2) (requiring that good reasons be provided in a decision for the weight given to treating sources' opinions); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (holding that the ALJ must set forth a basis for rejecting the opinions of a plaintiff's treating physicians).  Hendrix alleges that the ALJ completely ignored Dr. Joyce's opinion.  *See* 20 C.F.R. §§ 404.1527(d) (noting

that, generally, the SSA gives more weight to opinions from treating sources).  The ALJ explained, however, that he considered, but accorded little (if any) probative weight to, Dr. Joyce's report because her responses were inconsistent with her treatment notes and not supported by objective medical evidence in the record.  AR 18.  *See Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993) (stating that treating physicians' opinions receive substantial weight only when they are supported by clinical findings and consistent with the evidence).

Dr. Joyce saw Hendrix in June, July, and August of 2006 (AR 346-49) before completing a Physical Residual Functional Capacity (RFC) Questionnaire (AR 385-89).  Dr. Joyce's notes from each visit reflect that Hendrix's physical exam was "normal" and detail Hendrix's subjective complaints, but Dr. Joyce never evaluated Hendrix's functional ability.  AR 346-49 (responding "Don't know recommend a functional assessment," to a question asking how long Hendrix could sit and stand/walk in an eight-hour work day).  Nevertheless, Dr. Joyce opined that, among other restrictions, Hendrix was significantly limited in her ability to stand or sit, could not lift anything, and that Hendrix's pain would "constantly" interfere with her attention and concentration.  AR 386-87.

The ALJ correctly applied the factors set out in 20 C.F.R. §§ 404.1527(d) when he decided to give Dr. Joyce's opinion little weight.  *See also* Social Security Ruling (SSR) 96-5p, 61 Fed. Reg. 34,471 (1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Prior to completing the RFC Questionnaire, Dr.

5

Joyce saw Hendrix only three times over a two-month period, so the length, nature, and extent of their treatment relationship was not extensive. 20 C.F.R. §§ 404.1527(d)(2)(i), (ii). Additionally, Dr. Joyce's "extremely limiting" RFC assessment was inconsistent with her treatment records, Hendrix's own testimony, and Hendrix's medical record as a whole. AR 17; 20 C.F.R. §§ 404.1527(d)(4). There was also a lack of "medically acceptable diagnostic and clinical findings" to support Dr. Joyce's restrictions. AR 17-18 (noting "Dr. Joyce defers to neurology insofar as objective signs and clinical data in support of her assessment and she offers none of her own"); 20 C.F.R. § 404.1527(d)(3).

Although Hendrix asserts that the ALJ erred in his analysis, she has not referred the court to any medical evidence in the record that would support Dr. Joyce's conclusion.[1] *See* R. 9 at 2 (stating generally that "[t]he record is full of medical evidence which shows the major medical problems Ms. Hendrix suffers"). As discussed below, the record supports a finding that Hendrix's ability to work is somewhat impaired, but it does not suggest that she is totally disabled, despite Dr. Joyce's significant limitations. Accordingly, the ALJ did not err in rejecting Dr. Joyce's opinion in favor of less restrictive assessments provided by consultative physicians, Drs. Jane Brake (AR 372-375) and Jorge Baez-Garcia (AR 376-84).

Dr. Brake performed a mental RFC assessment and determined that Hendrix is only moderately limited in her ability to carry out detailed instructions; maintain

---

[1] In fact, the plaintiff does not cite to the administrative record once in her entire brief.

attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and complete a normal workday or week without interruptions from psychologically based symptoms.  AR 372-375.  Dr. Baez-Garcia, who performed a physical RFC assessment, opined that Hendrix could stand or walk about six hours in an eight-hour workday; frequently balance, kneel, crouch, and crawl; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; and frequently lift ten pounds, which Hendrix admitted at the hearing (AR 41), as long as she was not exposed to hazards like machinery and heights (AR 376-83).  Ultimately, the ALJ incorporated more restrictions into his RFC than those recommended by the consultative physicians, by restricting Hendrix to no more than frequent pushing and pulling and by noting that she should avoid concentrated exposure to full-body vibration.  AR 16.  The ALJ properly weighed the medical evidence, and his findings are supported by substantial evidence.

      B.      The ALJ duly considered the impairments that Hendrix suffered.

The ALJ took into account Hendrix's complaints of disabling pain and mental symptoms but adequately explained why he did not find her credible "at all in her assertion her impairments preclude any full-time work."  AR 18.  Hendrix complains that "the testimony of the Plaintiff is important" but that her testimony was "ignored in this matter."  R. 9 at 3, 5.  While it is Hendrix's burden to establish that she is disabled, *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233

(6th Cir. 1993), her own testimony is but one of many pieces of evidence that an ALJ must consider in making a decision. 42 U.S.C. § 423(d)(5)(A) (stating "an individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . there must be medical signs and findings . . . ").

Hendrix further alleges that "the ALJ failed to consider the impairments suffered by the Plaintiff" and faults the ALJ for concluding that her "impairments were not severe enough to meet the listed impairments." R 9 at 3-4. The court construes this as a claim that the ALJ improperly found that Hendrix's impairments did not meet a listing in the Listing of Impairments at Step 3. However, as Hendrix neither suggests what listing she believes her impairments met nor explains how her impairments satisfied the medical criteria for any listing, the court rejects this argument and finds that the ALJ did not err in concluding that Hendrix did not meet or equal a listing.

Hendrix testified that she suffered from multiple sclerosis (MS), although her neurologist, Dr. Jalil Shojaei, concluded that there was only a suspicion of MS. AR 275, 279, 294. Hendrix's VER was abnormal and she presented a history of optic neuritis, but her spinal fluid was negative for MS, and a battery of other tests were also negative or within normal limits. AR 275-92. Dr. Shojaei attributed the white matter abnormalities on Hendrix's brain MRI not to MS but to small-vessel disease from smoking one to one-and-a-half packs of cigarettes a day. AR 293-95.

Hendrix also complained of chronic pain throughout her whole body that

made it difficult for her to work, although she never specifically mentioned fibromyalgia at her hearing. AR 34-37. For pain, she regularly takes methadone and sporadically takes Lortab. AR 38. Hendrix was treated by Dr Linda Cornett for symptoms of fibromyalgia from March to May of 2006 (AR 266-74), but Dr. Shojaei believed her symptoms of diffuse pain and paresthesis were attributable to "fibromyalgia syndrome" (AR 294). As the ALJ pointed out (AR 13), the American College of Rheumatology requires a history of widespread pain and pain in eleven of eighteen tender point sites for a formal diagnosis of fibromyalgia, but Dr. Shojaei did not report that Hendrix had any specific tender points at all. *See Rose v. Hartford Fin. Servs. Group, Inc.*, 268 Fed. Appx. 444, 446 n.4 (6th Cir. 2008). Furthermore, although Hendrix complained to Drs. Van Meter and Allen of left shoulder pain, her X-rays were unremarkable (AR 249, 259) and an MRI did not reveal any discrete lateral tear or significant rotator cuff pathology (AR 248). There is no evidence that Hendrix followed through with recommended physical therapy.

Finally, Hendrix testified of her disabling mental impairments, especially her depression and anxiety disorder, although there is no objective medical evidence to support total disability from such conditions. Two consulting physicians, Dr. Marc Plavin and Dr. C. Christopher Allen, who evaluated Hendrix in July and August of 2006, rated her functioning at a 54, and 55, respectively. AR 305-12, 313-18. Based on Hendrix's self-reporting, Dr. Plavin diagnosed her with depressive disorder and panic disorder (in remission) (AR 311), and Dr. Allen diagnosed major

9

depressive disorder and moderate cognitive disorder.  Additionally, Dr. Allen noted that Hendrix has the ability to understand and remember instructions, although she may have difficulty carrying them out if they require motor skill; will likely relate to coworkers, although not supervision, appropriately; and has the ability to sustain concentration, persistence, and pace.  AR 314.  Dr. Shojaei recognized that her underlying borderline personality disorder contributed to her complaints of memory, poor sleep, anxiety, and depression and recommended that Hendrix see a psychologist or psychiatrist (AR 275-77), although Hendrix never did so.  Instead, Hendrix received very limited mental health treatment (AR 391-404), most of which consisted of discussions with a counselor about how her "disease" affected her and her family (AR 43-44).

The ALJ determined that there was a medical rationale for Hendrix's symptoms (AR 18); then, to determine whether she was disabled, he considered factors relevant to Hendrix's symptoms including her daily activities; the location, duration, frequency, and intensity of her pain and other symptoms; treatment, other than medication, she receives or has received for relief of her pain or other symptoms; and any measure she uses or has used to relieve her pain or other symptoms (20 C.F.R. § 404.1529(c)).

Hendrix admitted that she does not participate in physical therapy, although she does try to get some exercise on her "good days," which occur one or two days a week, by walking around the corner to the park where her son plays for

thirty minutes or so.  AR 36-37.  Hendrix uses a borrowed cane, although it was not prescribed to her by a treating physician (AR 26), and claims that she needs help getting in and out of a car, bathing, cleaning her house, and cooking (AR 40-47).  Although she claims to lie down or sleep ninety percent of the day because she is bored and because it helps "to sleep through the pain," she is able to enjoy and follow TV programs and movies, plays Old Maid with her son, closely follows her children's progress in school, and hosts cook-outs at her house twice a month.  AR 49-54.  Ultimately, the ALJ found that Hendrix's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (AR 18), and determined Hendrix's RFC for a limited range of light work.  Based on substantial evidence in the record and hypothetical questions to a vocational expert who identified a significant number of jobs that Hendrix could perform with those limitations, the ALJ properly determined that Hendrix was not disabled within the meaning of the SSA.

**IV.   Conclusion**

Accordingly, **IT IS ORDERED** that Hendrix's motion for summary judgment (R. 9) is **DENIED** and the Commissioner's motion for summary judgment (R. 10) is **GRANTED.**

Signed on  March 31, 2010



JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY